NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1005
_____

BATTLE BORN MUNITIONS INC,

Appellant,

v.

DICKS SPORTING GOODS INC
_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. No. 2-18-cv-1418)
District Judge:  Honorable Christy C. Wiegand
_____

Argued
January 12, 2023

Before:  JORDAN, PHIPPS and ROTH, *Circuit Judges*

(Filed  July 26, 2023)
_____

John M. Shoreman   [ARGUED]
McFadden & Shoreman
1050 Connecticut Avenue, NW
Ste. 500
Washington, DC   20036

Mario B. Williams
HDR
44 Broad Street, NW
Ste. 200
Atlanta, GA   30303
        *Counsel for Appellant*

Patrick L. Abramowich
John C. Hansberry   [ARGUED]
Nathan J. Marketich
Fox Rothschild
500 Grant Street
Suite 2500
Pittsburgh, PA   15219
        *Counsel for Appellee*

_____

OPINION*

_____

JORDAN, *Circuit Judge.*

Appellant Battle Born Munitions, Inc. ("BBM") filed a lawsuit against Dick's Sporting Goods, Inc., alleging a breach of contract claim and three tort claims.  Dick's successfully moved to dismiss the tort claims on the grounds that Pennsylvania's gist of the action doctrine bars such claims.  It also obtained dismissal of BBM's request for certain incidental contract damages.  BBM did, however, eventually prevail on its surviving claim for direct damages based on breach of contract.  It has now appealed the District Court's order depriving it of tort claims and incidental damages.  We will affirm.

_____

        * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

I.    BACKGROUND[1]

BBM, a licensed international broker of firearms ammunition, entered a Vendor Agreement in January 2016, pursuant to which it sold custom-branded ammunition to Dick's, a sporting goods retailer.  The Vendor Agreement is, by its terms, governed by the laws of Pennsylvania and contemplates a series of purchase orders to be negotiated between the two parties.  The provisions of the Vendor Agreement were to "apply to all purchase orders[,]" (J.A. at 38), while the purchase orders themselves would add details such as the price and quantity of goods.  The Vendor Agreement specified that Dick's would pay for ammunition within sixty days of delivery and would receive a two percent discount on payments made within thirty days of delivery.  The Agreement further stated that it "supersedes all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter thereof[,]" and it required that "any changes or modifications to or waivers of such terms and conditions must be in writing and signed by both Dick's and [BBM]."  (J.A. at 38.)  It also contained a limitation of damages clause, which excluded "any punitive, special, incidental or consequential damages of any kind (including, but not limited to loss of profits, business revenues, business interruption and the like)" regardless of whether the claim "is based upon ...

---

[1] The following facts are drawn from BBM's First Amended Complaint and the representations in its briefing.  Because we are reviewing a ruling on a motion to dismiss, we accept factual allegations of the complaint as true, view those facts in the light most favorable to BBM, and determine whether, under any reasonable reading of the complaint, BBM may be entitled to relief.  *See Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014).

breach of contract, negligence, tort, ... or any other legal theory or law," unless the damages "result from a party's gross negligence, fraud, or willful misconduct." (J.A. at 39.)

BBM alleges that it agreed to fulfil an unusually large purchase order in July and August 2016 because Dick's said it would accept delivery of the ammunition by November 2016. According to BBM, however, Dick's never intended to timely accept delivery of the goods. BBM acknowledges that it negotiated that purchase order "under the Vendor Agreement." (J.A. at 20.) Despite the no-modification clause in the Vendor Agreement, BBM did not request a written statement, signed by both parties, that required Dick's to take delivery of the ammunition by November 2016. Rather, BBM alleges that it relied on Dick's representation and invested substantial capital – nearly $4.5 million – to fulfill the large purchase order.

The fight arose when Dick's refused to accept delivery in November 2016. It instead notified BBM in December 2016, that, as BBM characterizes it, delivery would not be accepted "in a timeframe that was commercially reasonable." (J.A. at 22.) Dick's eventually accepted the goods in August 2017, nine months later than promised. In the meantime, BBM had paid warehousing fees to store the ammunition and spent additional money for product liability insurance, totaling $77,868. Those costs, along with certain alleged underpayments and chargebacks, are the direct damages BBM seeks.

As incidental (or consequential) damages, BBM alleged a substantial loss of profits because it had "lost the opportunity to sell twelve ... Bell helicopters to the government of Lebanon." (J.A. at 23.) We call those lost profits the "Helicopter

Damages." In December 2016, the government of Lebanon placed a $48 million purchase order with BBM for the helicopters, which was approved by the U.S. Department of Commerce, Bureau of Industry and Security. To procure the helicopters, BBM was required to deposit $3.72 million with the manufacturer, but BBM had depleted its available capital because it had invested $4.5 million in fulfilling the large purchase order from Dick's, and it had not yet been paid. As a result, the government of Lebanon terminated the contract and BBM lost what is characterizes as reasonably anticipated profits of over $5.2 million from the sale.

After instituting suit, and following an initial round of motions practice, BBM filed an amended complaint alleging breach of contract and three tort claims: fraud in the inducement to contract, negligent misrepresentation, and a third claim not at issue in this appeal.[2] As the foundation for those tort claims, BBM says "Dick's knew at the time" the order was placed that BBM was relying on Dick's representations and yet there was no way Dick's was going to accept the ammunition by November 2016 as promised. (Opening Br. at 4.) According to BBM, Dick's misrepresented its intentions in "order to bolster the value of its stock in 2016 and 2017[.]"[3] (J.A. at 25.) BBM claims Dick's

---

[2] The third tort claim is what the Restatement (Second) of Torts § 552 calls "Information Negligently Supplied for the Guidance of Others." BBM has not contested the dismissal of that claim.

[3] BBM states that Dick's stock value was under pressure due to competition from internet-based retailers, and Dick's was using market manipulation tactics to increase the value of its stock. BBM alleges that Dick's manipulated an inventory metric used by stock market analysts to appraise a retailer's financial performance by claiming to have available a large amount of ammunition, even though it had not yet accepted that ammunition from BBM. BBM states that this scheme was part of Dick's elaborate plan

"fraudulent promises were made to induce BBM to agree to the terms of the Vendor Agreement and Purchase Orders[.]"  (J.A. at 27.)

Dick's moved to dismiss the three tort claims against it on the basis that they were barred by Pennsylvania's gist of the action and economic loss doctrines, and to "partially dismiss [BBM]'s request for incidental, consequential, or lost profits damages on its breach of contract claim given the limitation of damages clause set forth in ... the Vendor Agreement."  (J.A. at 50.)  As more fully discussed herein, under Pennsylvania law, the gist of the action doctrine "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims."  *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (citing *Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. 1992)); *see Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) (holding that the gist of the action doctrine bars tort claims if the allegedly breached duties rise solely from the contract between the parties).[4]

---

to "t[ie] up the manufacturing capacity of key manufacturers and obtain[] sufficient control of the retail calibers to manipulate the market price [of ammunition.]"  (J.A. at 26.)  According to BBM, Dick's plan was to "hoard ammunition inventories in warehouses of its vendors ... to set the price [of ammunition] as demand rose."  (J.A. at 26.)

[4] The economic loss doctrine operates in much the same way, being designed to maintain the conceptual distinction between contract and tort claims.  *See Dittman v. UPMC*, 196 A.3d 1036, 1054 (Pa. 2018) (holding that the economic loss doctrine precludes actions where the duty allegedly breached arises under a contract between the parties).  "Specifically, if the duty arises under a contract between the parties, a tort action will not lie from a breach of that duty.  However, if the duty arises independently of any contractual duties between the parties, then a breach of that duty may support a tort action."  *Id.*

The District Court agreed with Dick's and granted the motion to dismiss the tort claims. It held that "the duties [BBM] claims Dick's breached through its alleged misrepresentations, i.e., to accept delivery of the custom-branded ammunition by November 2016 and pay for same within 30-60 days of delivery, were created by the express terms of the parties' contracts." (J.A. at 45.) The Court noted that BBM's complaint admits that the allegedly breached duties do not arise independently of the contracts[5] and that BBM's allegations that Dick's engaged in market and stock manipulation "merely provide purported reasons why Dick's delayed accepting delivery" and ignore "the fact that the contract itself created the rights [BBM] seeks to enforce in the first instance ... ." (J.A. at 46.) The Court was unpersuaded by BBM's argument that it had pled a fraudulent inducement claim and that the gist of the action doctrine does not apply to such claims. While BBM endeavored to separate the large purchase order at issue from the Vendor Agreement, the Court rejected that effort, treating the Vendor Agreement as the governing contract and concluding that "one cannot be fraudulently induced to enter into an agreement by misrepresentations made after the formation of the contract." (J.A. at 47-48.)

The District Court also dismissed BBM's request for the Helicopter Damages, given the limitation of damages provision in the Vendor Agreement. Acknowledging

---

[5] BBM expressly incorporated its factual allegations from its breach of contract claim into its three tort claims. The District Court stated that this incorporation is an admission "that the duties that Dick's accept delivery of the custom-branded ammunition and pay for it were created by their contracts and do not arise independently of the contracts." (J.A. at 46.)

that the provision had an exception for fraud, gross negligence, or willful misconduct, the Court nevertheless said, "in light of the ... finding that the fraud claims are subject to dismissal for failure to state a plausible claim for relief," the Helicopter Damages "are unavailable to remedy a breach of the Vendor Agreement." (J.A. at 51.)

The dismissal was with prejudice because the Court decided "any amendment would be futile[,] given the ... analysis of defenses of the tort and damages claims[.]" (J.A. at 52.) BBM attempted to resurrect its tort claims in a duplicative action in Nevada, *Battle Born Munitions, Inc. v. Dick's Sporting Goods, Inc.*, No. 3:19-cv-00561-MMD-CLB, 2020 WL 1891859 (D. Nev. Apr. 16, 2020), but that action was also dismissed, the Nevada federal court stating that it "[would] not allow Plaintiff to 'engage in an end-run around' [the United States District Court for the Western District of Pennsylvania]'s decisions by allowing Plaintiff to proceed with class allegations and seek Helicopter Damages here." *Id.* at *6. BBM's breach of contract claim continued in the Western District of Pennsylvania, and, pursuant to the parties' joint stipulation on damages, the District Court entered a judgment for BBM in the amount of $123,070. BBM then appealed, contesting the dismissal of its fraudulent inducement and negligent misrepresentation claims and its request for Helicopter Damages from its breach of contract claim.

## II.   DISCUSSION[6]

We first consider the dismissal of the tort claims. Pennsylvania's gist of the action

---

[6] The District Court had diversity jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review of a

doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims." *eToll*, 811 A.2d at 14. The doctrine precludes the recasting of ordinary breach of contract claims as tort claims, but that does not mean that a contract can never be involved in a tort claim. *Id.* "To be construed as in tort ... the wrong ascribed to defendant must be the gist of the action, the contract being collateral." *Id.* (internal quotation marks omitted).

In making a "gist of the action" determination, courts have guidance from the Supreme Court of Pennsylvania to this effect: "If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of the contract[,]" then the claim is viewed as one for breach of contract; but, "[i]f ... the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort." *Bruno*, 106 A.3d at 68. Accordingly, as further described by the Pennsylvania Supreme Court in *Bruno*, the doctrine bars tort claims in four situations: "(1) where the tort claim 'aris[es] solely from a contract between the parties'; (2) where 'the duties allegedly breached were created and grounded in the contract itself'; (3) where 'the liability stems from a contract'; or (4) where the tort claim 'essentially duplicates a

---

district court's granting of a motion to dismiss. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009). A motion to dismiss under Fed. R. Civ. P. 12(b)(6) may only be granted if "the allegations in a complaint, however true, could not raise a claim of entitlement to relief[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). "But a court need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

breach of contract claim or the success of which is wholly dependent on the terms of a contract.'" *Id.* at 67 (quoting *eToll*, 811 A.2d at 19). Fraud in the inducement claims are ordinarily not barred by the gist of the action doctrine, "because fraud to induce a person to enter into a contract is generally collateral to ... the terms of the contract itself." *eToll*, 811 A.2d at 17. In contrast, claims of fraud in the performance of a contract are barred by the doctrine. *Id.* at 17-20.

In the present matter, BBM's tort claims arguably fall under several of the four situations described in *Bruno*. The claims are barred by the gist of the action doctrine because the duties at issue arise solely from the Vendor Agreement and follow-on purchase orders, regardless of the motives BBM wants to ascribe to Dick's. By the same token, those duties are created and governed in the parties' contractual relationship, and the claimed liability stems from the contractual agreement. There is no "broader social duty," *Bruno*, 106 A.3d at 68, at play in this case. But for the assertion that Dick's failed to fulfill its end of the bargain, there would be no case at all. The purchase agreement established a duty for Dick's to accept the custom-branded ammunition by a certain date, all other terms being provided by the Vendor Agreement. Contractual duties alone are at issue.

BBM attempts to avoid this straightforward application of the gist of the action doctrine by arguing that the promise Dick's made to accept delivery by November 2016 is an improper framing of the breached duty. By BBM's lights, Dick's fraudulent misrepresentations "constitute the breach of a social duty not to affirmatively mislead

where it is known reliance will be placed on the representation."[7]  (Opening Br. at 11.)

Those misrepresentations, says BBM, led to the formation of the July and August 2016

purchase orders, and those purchase orders were "separate contracts that BBM had

discretion to accept or reject."  (Opening Br. at 12.)

BBM's argument is essentially an attempt to recast its fraud in the performance

claim as a fraud in the inducement claim, which is not barred by the gist of the action

doctrine.  Its complaint likewise invokes the language of fraud in the inducement, not in

the performance, but we are not bound to accept the labels a party chooses.  *See Bruno*,

106 A.3d at 68 ("[T]he mere labeling by the plaintiff of a claim as being in tort, e.g., for

negligence, is not controlling.").  As the District Court properly noted, the Vendor

Agreement was signed before the allegedly fraudulent misrepresentations, and the

misrepresentations cannot have retroactively induced BBM to enter the contractual

arrangements which underlie every claim in the complaint.  BBM says that the

misrepresentations led to the formations of the purchase orders, not the Vendor

Agreement, but that contention overlooks that the Vendor Agreement's terms "apply to

all purchase orders[.]"[8] (Opening Br. at 16.)  Although BBM was free to accept or reject

---

[7] The amended complaint states that "Dick's fraudulently induced BBM to enter into the subject Vendor Agreement and the subject Purchase Orders[,]" that "Dick's misrepresented to BBM that it would take delivery of branded ammunition no later than November 2016 in order to induce BBM to accept the Purchase Orders," that "Dick's knew the representation ... was false," and that "Dick's intended to mislead BBM[.]" (J.A. at 29-30.)

[8] Our dissenting colleague contends that it is unreasonable to infer that the Vendor Agreement is fully integrated with the purchase orders as the purchase orders were negotiated after the Vendor Agreement and they contain essential price and quantity

any purchase order, all subsequent purchase orders were subject to the terms of the

Vendor Agreement.  BBM's claim is one of fraudulent performance on the Vendor

Agreement, which, by its terms, governed every interaction of the parties, including

purchase orders entered pursuant to that master contract.  A fraudulent performance claim

is clearly barred by the gist of the action doctrine. *See eToll*, 811 A.2d at 20 ("[T]he gist

of the action doctrine should apply to claims for fraud in the performance of a

contract.").[9]

If we assume, as does BBM, that the purchase orders are separate contracts and the

breached duty is a general societal duty not to mislead others into entering contracts, then

BBM has arguably pled a fraud in the inducement claim.  But even then, the parol

evidence rule, coupled with the Vendor Agreement's integration and no-modification

_____

terms that are absent from the Vendor Agreement.  But that contention overlooks what
the parties very plainly agreed would bind them.  The Vendor Agreement is clear that its
terms "apply to all purchase orders[.]"  (J.A. at 38.)  If the purchase orders were
somehow contracts that had an independent status, separate from the Vendor Agreement,
one would expect some additional language in them varying or disclaiming the terms of
the Vendor Agreement, especially considering that the Vendor Agreement's no-
modification clause explicitly requires "any changes or modifications to or waivers of
such terms and conditions" to be "in writing and signed by both Dick's and [BBM]."
(J.A. at 38.)  And although the Vendor Agreement lacks quantity and price terms, it
defined those terms as being specified in later purchase orders.  The strong, remarkably
clear language in the Vendor Agreement indicates that the parties intended for their
ongoing business relationship to be governed by the Vendor Agreement, and that the
purchase orders would simply be orders, the terms of which were dictated by the Vendor
Agreement.

[9] Because the economic loss doctrine is closely related to the gist of the action
doctrine and we are satisfied that the gist of the action doctrine bars BBM's tort claims,
we need not consider the economic loss doctrine separately.

clauses, would bar BBM's tort claims. [10]  *See Toy v. Metropolitan Life Ins. Co.*, 928 A.2d

186, 204-05 (Pa. 2007) (holding that the fraud exception to the parol evidence rule does

not apply to fraud in the inducement of a contract).

"The parol evidence rule is a substantive rule of contract law that prevents the use

of extrinsic evidence to nullify, modify, or augment the terms of a contract."

*SodexoMAGIC, LLC v. Drexel University*, 24 F.4th 183, 213 (3d Cir. 2022).  Parol

evidence, however, may be introduced to vary a fully integrated contract when the

contract is ambiguous or when a term was omitted from the contract because of fraud,

accident, or mistake.  *Toy*, 928 A.2d at 204-05.  The Pennsylvania Supreme Court has

restricted the fraud exception to parol evidence "to allegations of fraud in the execution

of a contract, and has refused to apply the exception to allegations of fraud in the

inducement of a contract."  *Id.*  "[W]hile parol evidence may be introduced based on a

---

[10] The District Court noted that BBM's tort claims were barred by the parol evidence rule because the Vendor Agreement was fully integrated and required any modifications to be in a writing signed by both parties.  In Pennsylvania, "fraud-in-the-inducement claims are commonly barred if the contract at issue is fully integrated." *Hart v. Arnold*, 884 A.2d 316, 340 (Pa. Super. Ct. 2005).  This rule is based on the rationale that "a party cannot justifiably rely upon prior oral representations and then sign a contract containing terms that refute the alleged prior oral representations." *Id.* (internal quotation marks omitted).  Therefore, the parol evidence rule also requires allegations that the representations "were fraudulently or by accident or mistake omitted from the integrated written contract." *Id.*  "To require less would make a mockery of the parol evidence rule because all a party would have to do to avoid, modify[,] or nullify [a contract] would be to aver that false representations were 'fraudulently' made." *Id.* (second alteration in original) (quoting *Nicolella v. Palmer*, 507 A.2d 20, 23 (Pa. 1968)).  Relying on that rationale, the District Court concluded that "insofar as [BBM] contends that Dick's employees misrepresented that it would accept delivery by a date certain not specified in the Vendor Agreement nor the [purchase order]'s, any such claim is barred by the parol evidence rule."  (J.A. at 49.)

party's claim that there was fraud in the execution of a contract, *i.e.*, that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *i.e.*, that an opposing party made false representations that induced the complaining party to agree to the contract." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 n.26 (Pa. 2004).

We have opined that, under Pennsylvania law, "the parol evidence rule *acting alone* does not prevent fraudulent inducement claims arising out of integrated contracts" because "the purpose of extrinsic evidence is to prove a precontractual misrepresentation or concealment – not to alter or vary the terms of the contract." *SodexoMAGIC*, 24 F.4th at 213. But contract drafters can "extend[] the reach of the parol evidence rule" by writing a fraud-insulating clause into their contract, which "prevent[s] a party from satisfying the justifiable-reliance element of a fraudulent inducement claim." *Id*. at 213-14. When a contract has a fraud-insulating provision, "it is virtually impossible to establish the justifiable-reliance element needed for a fraud claim." *Id*. at 214; *see Toy*, 928 A.2d at 207 ("[D]ue to the parol evidence rule's operation, a party cannot be said to have justifiably relied on prior representations that [a party] has superseded and disclaimed[.]"). Two such examples are clauses that state that the representations in the contract supersede all prior representations, *Yocca*, 854 A.2d 425, 431 (Pa. 2004), or are the only representations made, *1726 Cherry St. P'Ship v. Bell Atl. Props., Inc.*, 653 A.2d 663, 670 (1995).

BBM does not dispute that the Vendor Agreement is integrated, nor did it contest the validity of the integration clause before the District Court. It has thus forfeited any

arguments to the contrary. *See Garza v. Citigroup Inc.*, 881 F.3d 277, 284 (3d Cir. 2018) ("To preserve a matter for appellate review, a party 'must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits."); *DirecTV, Inc. v. Seijas*, 508 F.3d 123, 125 n.1 (3d Cir. 2007) ("It is well established that arguments not raised before the District Court are [forfeited] on appeal."). But arguments to the contrary would not be compelling anyway. The Vendor Agreement's integration clause is clear, and its terms, including the integration clause, "shall apply to all purchase orders[.]" (J.A. at 38.) Although some terms, like price and quantity, are contained in the purchase orders, the Vendor Agreement defines those terms in relation to such purchase orders. For instance, the price of ammunition "shall be the prices specified in the purchase orders[,]" and the quantity of ammunition must not be "in excess of [the quantity] set forth in a purchase order[.]" (J.A. at 87.) The Vendor Agreement, and therefore any subsequent purchase order, also incorporates the Routing and Transportation Guide for Dick's Sporting Goods, which presumably set the essential terms for delivery.[11] In light of the integration clause and description of all essential terms, the Vendor Agreement and all subsequent purchase orders are properly understood as being integrated.[12]

---

[11] As the Routing and Transportation Guide for Dick's Sporting Goods is on a website that requires a vendor's credentials to access, we cannot examine the precise requirements for delivery.

[12] The dissent contends that we misapply the parol evidence rule because it is unreasonable to infer at the pleading stage that the Vendor Agreement is fully integrated

Instead of arguing that the Vendor Agreement and purchase orders are not integrated, BBM asserts only that the Vendor Agreement's integration clause is not fraud-insulating, as it contains no reference to representations made after the Vendor Agreement was signed but before the purchase orders were executed.  Not so.  The Vendor Agreement states that it "supersedes all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter hereof[.]" (J.A. at 38.)  Although the integration clause does not expressly mention representations made after the Vendor Agreement's execution – understandably so because the contract would have already been signed – the no-modification clause requires that "any changes or modifications to or waivers of such terms and conditions must be in writing and signed by both Dick's and [BBM]." (J.A. at 38.)  This language plainly indicates the parties' intent that the Vendor Agreement be fraud insulating, as any later interactions between the parties were to be in a signed writing to have any effect.  If BBM intended to rely on Dick's oral representations, it should have requested a written and signed modification.

We turn next to whether the District Court properly dismissed BBM's request for Helicopter Damages in its breach of contract claim.  BBM argues that the District Court "did not find that BBM's fraud claims were insufficiently pled[,]" and it was therefore error to ignore the fraud exception in the limitation of damages provision.  (Opening Br.

---

with the subsequent purchase orders.  For the reasons already noted, *supra* note 8, the Vendor Agreement and any subsequent purchase orders are best viewed as integrated.

at 18.)  Although BBM is correct that the District Court did not scrutinize the fraud claims under a Fed. R. Civ. P. 9(b) analysis, the District Court was not required to do so since it found that the fraud claims were barred by the gist of the action doctrine.  Given that doctrine's application, the Court concluded "that the fraud claims are subject to dismissal for failure to state a plausible claim for relief[.]"  (J.A. at 51.)  Citing no legal authority, BBM suggests that, because the misrepresentations predate the purchase orders and "were made in order to secure BBM's acceptance of Purchase orders for substantially increased amounts of ammunition[,]" the exception in the limitation of damages provision is met.  (Opening Br. at 18.)

We understand the District Court's holding to be that the simple inclusion of one word – fraud – in the limitation of damages provision is not sufficient to overcome the gist of the action doctrine.  If the parties had intended to convert a breach of the Vendor Agreement from a potential claim in contract to one in tort, they would have been far more explicit in saying so.  BBM gives us no way to understand the fraud exception in the limitation of damages provision outside of its general assertion that the inclusion of "fraud" indicates that the parties intended to be exposed to tort claims in a breach of contract action.  But, without clearer language from the parties in their contract, we must read the limitation of damages provision to be consistent with Pennsylvania's gist of the action doctrine and parol evidence rule.  As the gist of the action doctrine precludes fraud in the performance claims, and the parol evidence rule along with the inclusion of fraud-insulating language within the contract precludes fraud in the inducement claims, the word "fraud" in the provision must be understood to cover fraud in the execution claims.

17

*See Yocca*, 854 A.2d at 436 n.26 ("[P]arol evidence may be introduced based on a party's claim that there was fraud in the execution of a contract, *i.e.*, that a term was fraudulently omitted from the contract[.]"). As BBM has not pled any allegations of fraud in the execution, the limitation of damages provision prevents BBM from recovering Helicopter Damages on its contract claim.

**III.    CONCLUSION**

For the foregoing reasons, we will affirm.

*Battle Born Munitions Inc. v. Dick's Sporting Goods, Inc.*, No. 22-1005.
PHIPPS, *Circuit Judge*, dissenting in part.

Contrary to the governing pleading standard, the Majority Opinion draws *unreasonable* inferences *against* the plaintiff, Battle Born Munitions Inc., in assessing the plausibility of its fraud allegations. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 334 (3d Cir. 2022). Based on those improper inferences, the Majority Opinion then affirms the dismissal of Battle Born's misrepresentation claims based on the gist of the action and economic loss doctrines as well as the parol evidence rule. I see it differently and respectfully dissent in part.

The Majority Opinion infers from the operative complaint that the Vendor Agreement between Dick's Sporting Goods and Battle Born – together with later purchase orders – combine to form a singular, fully integrated contract. Neither the complaint nor the Vendor Agreement, which is attached to the complaint as an exhibit, says that. Rather, the Vendor Agreement sets forth general terms and conditions under which Battle Born would serve as a vendor for Dick's. The Vendor Agreement does not identify the type of goods that Battle Born would supply, nor does it specify prices or quantities. The parties could agree to those key components of a sale of goods through subsequent purchase orders – none of which are attached to the complaint. So, based on the pleadings, it is not reasonable to infer that the Vendor Agreement did anything other than establish the ground rules for a business relationship between the parties. Likewise, with scarce allegations about the subsequent purchase orders, it is not reasonable to infer that the integration clause in the Vendor Agreement covers the later purchase orders, especially since that clause, by its own text, does not extend to subsequent agreements. *See* Vendor Agreement ¶ 24 (App. 89) ("This Vendor Agreement supersedes all prior written and oral and all contemporaneous oral agreements and understandings with

respect to the subject matter hereof . . . .").  Thus, at the pleadings stage, a reasonable inference in Battle Born's favor is that subsequent purchase orders separately created additional contractual obligations.

I agree with the Majority Opinion that the Vendor Agreement applies to later-negotiated purchase orders.  But that does not mean that the Vendor Agreement is fully integrated with all subsequent purchase orders.  An integration clause confirms the completeness of the parties' agreement on the subject-matter of the agreement and, in conjunction with the parol evidence rule, prevents additional terms from being read into that agreement (at least without subsequent modification of the agreement by the parties).  *See generally Integration Clause*, Black's Law Dictionary (10th ed. 2014).  Thus, it is unreasonable to infer that the integration clause in the Vendor Agreement reaches later-negotiated purchase orders that contain price and quantity terms that were wholly absent from the Vendor Agreement.  While many terms of the Vendor Agreement may apply prospectively, its integration clause cannot.  Accordingly, the reasonable inference is that the purchase orders created additional, separately agreed-upon contractual obligations.

The Majority Opinion bases its application of the gist of the action and economic loss doctrines on the contrary inference.  From its perspective that the Vendor Agreement and purchase orders comprise a singular, fully integrated contract, the Majority Opinion concludes that the alleged misrepresentations made by Dick's in negotiating the subsequent purchase orders would be at worst fraud in the performance of a contract.  And such a claim, because it arises out of a contractual duty, is not separately actionable in tort under both the gist of the action and the economic loss doctrines.  *See Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) (holding that gist of the action forecloses tort claims based on alleged breaches of solely contractual duties); *Dittman v. UPMC*,

2

196 A.3d 1036, 1054 (Pa. 2018) (holding that the economic loss doctrine prohibits tort claims seeking to recover purely economic losses that are rooted only in contractual duties); *see also eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 19–20 (Pa. Super. Ct. 2002).  But that conclusion collapses if the purchase orders, rather than the Vendor Agreement, were the source of Battle Born's contractual obligation to deliver specified quantities of ammunition at set prices.  In that scenario, Dick's would be under a general societal duty not to intentionally deceive Battle Born into undertaking those new contractual responsibilities.  *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 217 (3d Cir. 2022) ("[A] precontractual duty not to deceive through misrepresentation or concealment exists independently of a later-created contract.").  And if Battle Born were afforded the reasonable inference that the later negotiated purchase orders created additional, separately agreed-upon contractual obligations, then neither the gist of the action nor the economic loss doctrines would bar tort claims related to misrepresentations by Dick's in negotiating the purchase orders.

For similar reasons, the Majority Opinion misapplies the parol evidence rule.  That rule applies only to integrated contracts,[1] and as explained above, it is unreasonable to infer that the Vendor Agreement is fully integrated with later purchase orders.  That is not to say that the Vendor Agreement says nothing about terms and conditions for subsequent purchase orders; it means only that those later orders separately impose additional obligations, and for that reason, they should not be inferred to be encompassed within the

---

[1] *See, e.g.*, *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 205 (Pa. 2007) ("[F]or the parol evidence rule to apply, there must be a writing that represents the parties' entire contract . . . ." (citing *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004))); *Yocca*, 854 A.2d at 436 ("[F]or the parol evidence rule to apply, there must be a writing that represents the 'entire contract between the parties.'" (quoting *Gianni v. Russell & Co.*, 126 A. 791, 792 (1924))).

3

Vendor Agreement's integration clause.  Accordingly, the parol evidence rule does not foreclose consideration of extrinsic evidence arising after entry of the Vendor Agreement, especially evidence of later misrepresentations regarding purchase orders.

Despite these differences, I join the outcome reached by the Majority Opinion with respect to Battle Born's fraud claim for the failed sale of helicopters to Lebanon. Although proximate cause is not universally an element of a fraud claim at common law,[2] Pennsylvania requires it.  *See Gibbs v. Ernst*, 647 A.2d 882, 889 & n.12 (Pa. 1994); *see also SodexoMAGIC*, 24 F.4th at 205.  And even under a favorable construction of the allegations in Battle Born's complaint, the delayed payment for the ammunition is too attenuated from Battle Born's inability to finance a helicopter deal to qualify as proximate cause.

For these reasons, I would vacate the dismissal of all components of Battle Born's misrepresentation claims except those related to the helicopter sale.

---

[2] *Compare* Restatement (Second) of Torts § 548A (Am. L. Inst. 1977) ("A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance."), *with* Restatement (First) of Torts § 546 (Am. L. Inst. 1938) ("The maker of a fraudulent misrepresentation in a business transaction is liable for pecuniary loss caused to its recipient by his reliance upon the truth of the matter misrepresented if his justifiable reliance upon the misrepresentation is a substantial factor in determining the course of conduct which results in his loss.").  *See generally* Mark P. Gergen, *A Wrong Turn in the Law of Deceit*, 106 Geo. L.J. 555, 589–92 (2018) (summarizing the emergence of the proximate causation element of fraud claims).